# State ex rel. Attorney General v. Tally, Judge, &c.*

## Impeachment Proceedings.

|102 | 25|
|108 | 16|
|102 | 25|
|111 | 484|

|102 | 25|
|117 | 178|

|102 | 25|
|130 | 112|

|102 | 25|
|134 | 68|

|102 | 25|
|140 | 171|

1. *Impeachment proceedings; competent evidence.*—In impeachment proceedings against a circuit judge in which he is charged (1) with willful neglect of duty while in office, in that, knowing the intent of three of his brothers-in-law and of a cousin of them and his wife to take the life of one R., and having the opportunity to intervene in his official capacity to prevent the execution of their intent, he willfully failed and neglected to do so, and (2) with complicity in the murder of R. by such persons, the fact that R. had seduced or been criminally intimate with a sister of respondent's wife and of three of such persons and a cousin of the fourth, is competent evidence as *tending to connect* respondent with the motive which actuated the said four persons to kill R.

2. *Same; incompetent evidence.*—Aside from the abstract fact of such seduction or criminal intimacy, other evidence on the subject, including letters written by R. to such sister, is irrelevant and immaterial to any issue that could possibly be made in such case, it being proved that the respondent and the slayers of R. had full knowledge of the liaison between R. and the sister long before the killing of R.

3. *Testimony as to uncommunicated intention.*—A witness, or a party testifying as a witness, can not state the uncommunicated motive or intention with which an act was done.

4. *Privileged communications; attorney and client.*—Communications made by a person in a conversation with an attorney with the view on retaining said attorney are privileged; and, although the relation of attorney and client is never established, such communications ca~ not be called out as evidence.

*The opinion in this case was rendered August 9, 1894; but by reason of tance of the case. it is reported in this volume, without regard to date of ment.

[State ex rel. Attorney General v. Tally, Judge, &c.]

5. *Impeachment; evidence to justify conviction.*—An impeachment proceeding against a public officer being criminal in its nature, the respondent can not be adjudged guilty as charged until his guilt is established by the evidence beyond a reasonable doubt.

6. *Finding of the court on the first count of the information.*—After a careful consideration of the testimony adduced on the hearing of this cause, it is adjudged and declared that the evidence does not sustain the first count of the information, that charges the respondent with willful neglect of duty, in that, knowing the intent of four persons to take the life of another, and having the opportunity to intervene in his official capacity to prevent the execution of such intent, he willfully failed and neglected to do so.

7. *Aid in the commission of a homicide; evidence thereof* — Where it is shown by evidence that one accused of murder knew of the flight of the man who was killed and of his pursuit by three brothers-in-law of the accused and their cousin with the intention to take his life, and that, with this knowledge, the accused kept watch at the telegraph office in the town whence the pursued and pursuers started to prevent warnings of danger being sent to the pursued, and that when a kinsman of the pursued delivered to the operator a telegram saying, "Four men on horseback with guns following. Look out," the accused immediately delivered a telegram to the operator addressed to the operator who was to receive the first telegram and who was a friend of the accused, telling him, "Do not let party warned get away. Say nothing;" and at the time of delivering this telegram to the operator to be sent, the accused said to him : "This message has something to do with the one you have," referring to the one just delivered by the kinsman of the pursued man, such acts on the part of the accused are calculated to aid, and will be held to have been committed by him with the intent to aid, the pursuers to kill the party pursued. (HEAD, J., dissenting.)

8. *No distinction between principals in the first and second degree.*—Under the provisions of section 3704 of the Code of 1886 there is no distinction between principals in the first and second degree as obtained under the common law; and "all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid or abet in its commission, though not present," must be indicted, tried and punished as principals.

9. *"Aid" or "abet"; what necessary.*—To aid or abet in the commission of a crime, it is necessary that assistance should be rendered by acts or words of encouragement or support, or, when no assistance is given, that there should be presence, actual or constructive, by prearrangement, special or general, or at least to the knowledge of the principal, with the intent to render assistance, should it become necessary.

). *Same; necessary that said aid should contribute to the killing to murder.*—Where one is charged with aiding or abetting oth-

[State ex rel. Attorney General v. Tally Judge, &c.]

ers in the commission of murder, it is essential to the guilt of the one so charged that the acts committed by him should in fact have contributed to the death of the deceased at the hands of his slayers.

11. *Same.*—To make one an aider or abettor in the commission of murder, it is not necessary that the assistance should have so contributed to the criminal result that but for it the killing would not have been committed. It is sufficient, if the aid facilitated a result that would have transpired without it; if it put the deceased at a disadvantage, by depriving him of a single chance of life which he might otherwise have had, although it could not be known or shown that the deceased would have availed himself of that chance.

12. *Aider and abettor in murder; when shown by the evidence.*—Where one of the counts of the information in an impeachment proceeding charges the respondent with aiding and abetting in the commission of murder, and it is shown by the evidence that immediately after a kinsman of the deceased had sent a telegraphic message warning him of his being pursued by four armed men on horseback, the respondent sent a telegram to the operator, who was to receive such message of warning, and whose duty it was to deliver it at once, and who was a personal friend of respondent, and this latter telegram from respondent caused the operator to delay in delivering the message of warning to the deceased, and by such delay made deceased's escape from death more difficult, and rendered more easy and certain the accomplishment of the pursuers' intention to kill him, which intention was known by respondent at the time he sent said telegram, the respondent aided and abetted in the murder of the deceased, and was guilty as charged in said count. (HEAD, J., dissenting.)

This was an impeachment proceeding against John B. Tally, Judge of the Ninth Judicial Circuit of Alabama, and was commenced in the Supreme Court by an information filed on the part of the State by William L. Martin, as Attorney-General, founded upon a report of the grand jury of Jackson county. The facts of the case are sufficiently stated in the opinion.

WILLIAM L. MARTIN, Attorney-General, and R. W. WALKER, for the State. All the evidence as to any relations between R. C. Ross and Annie Skelton should be excluded from consideration. The knowledge or information on this subject which the Skeltons had on the day of the killing, they had had for at least a month prior to that time. So long a cooling time having elapsed, evidence of such knowledge was not admissible for the purpose of reducing the grade of the homic from murder to manslaughter, the only purp which such evidence is admissible in any ca

*v. State*, 99 Ala. 166; *Fields v. State*, 52 Ala. 354; *Reese v. State*, 90 Ala. 627.

A witness should not be permitted to testify as to his uncommunicated intentions.—*Lewis v. State*, 96 Ala. 6, and cases there cited.

The charge of willful neglect of duty was fully made out. The respondent, with knowledge that Ross had returned to Scottsboro, that the Skeltons were "on the war path" for him, saw three of the Skeltons on horseback, with guns, early Sunday morning, starting hurriedly out of town, evidently on some war-like mission. With knowledge of their previous threat to kill Ross, even if that threat was conditional, it can not be imagined that any other thought entered respondent's mind when he witnessed the demonstration than that the Skeltons were starting out in pursuit of Ross, intent upon killing him. After stopping and talking to Bob Skelton, respondent, according to his own admission, went into his house, there learned the truth of the matter, and then walked out to his front gate, and was there seen by witnesses for the State standing watching the Skeltons as they rode out of town. Under the circumstances, with the knowledge the respondent then had. the acts of the Skeltons in his presence as clearly amounted to a threat to kill Ross as if respondent had admitted that Bob Skelton, in the interview near respondent's barn, had fully developed their plans and purposes. The acts in respondent's presence "reasonably threatened murder."—*Jones v. State*, 100 Ala. 88; *Martin v. State*, 89 Ala. 115; *Hayes v. Mitchell*, 69 Ala. 452. The defendant then had the authority to order the Skeltons into an undertaking to keep the peace. Code, §4697. Certainly, the highest law officer in the county should be held to some degree of diligence in the performance of so grave a duty.—2 Wharton Crim. Law, (7th Ed.), 2526, 2528.

Any one coming into a conspiracy at any stage of the proceedings, with knowledge of its existence, is regarded in law as a party to all the acts done by any of the other parties, before or afterwards, in furtherance of the common design. No pre-arrangement is necessary. One, who with knowledge or information of the lawful design of others, is present, actually or constructively, aiding, abetting or assisting, or ready to

[State ex rel. Attorney General v. Tally, Judge, &c.]

aid, abet or assist, is a guilty participant — *United States v. Sacia*, 2 Fed. Rep. 755, 757–58; *Tanner v. State*, 92 Ala. 1; *Martin v. State*, 89 Ala. 115 ; *Spies v. People*, 122 Ill. 1.   The words "aid" and "abet" comprehend all assistance rendered by acts, words of encouragement or support, or presence, actual or constructive, to render assistance, should it become necessary.—*Raiford v. State*, 59 Ala. 106.   Where an effort to do a criminal act fails of consummation, simply because of obstructions in the way, not apparent to the person making the effort, which rendered the crime incapable of accomplishment by him, such abortive effort is a criminal attempt, where the law makes a mere attempt to do such act criminal. *Mullen v. State*, 45 Ala. 43 ; *People v. Moran*, 20 Amer. St. Rep. 732.

WILLIAM RICHARDSON, D. D. SHELBY, JOHN A. LUSK, GEORGE C. HUNT and AMOS GOODHUE, for respondent. There is a total absence of any evidence that the respondent at any time was in consultation with the Skeltons or either of them, concerning the killing of Ross.   He is shown to have been in consultation with Robert S. Skelton on the evening before the homicide, but this in no way concerning the killing of Robert C. Ross, but was regarding the ascertaining of the whereabouts of a sister, whom the defendant with the Skeltons desired to rescue from a life of shame and disgrace, and save from becoming the subject of a public scandal.   It is true, circuit judges are magistrates and conservators of the peace.—Code of Alabama, 1875, Art, VI, Par. 16; 1 Cooley's Blackstone, 350; Code of 1886, § 4680.   But there are only certain contingencies under which they are authorized to exercise their power as such, in the manner in which it is charged this defendant neglected to act.   1. When complaint on oath is made to them charging the commission of an offense has been threatened.—Code of Ala., 1886, § 4681, *et seq.*; 2 Amer. & Eng. Encyc. of Law, 516, § 2; and, 2, when an offense is committed or threatened in the presence of such magistrate, or when he sees such acts as show a reasonable ground for the arrest.—Code of 1886, § 4697; *Jones v. State*, 100 Ala. 88 ; Code 1886, § 4265.   There is in the evidence in this case, total absence of any threat and any act in the presence or within the knowledge of this respondent, on the part of either of the four named

Skeltons, to do Ross any harm whatever. He had no knowledge or suspicion of such a thing except after they had gone beyond any opportunity on the part of any one in Scottsboro to interpose any obstacle. There is no evidence in the record sustaining the smallest fragment of the first count and its four specifications so far as they relate to this defendant.

The second count in the information, is a charge of murder alleging in the several specifications substantially the same thing, but, under the pleadings and the evidence in this case, depending solely on the proof being made that the respondent entered into a conspiracy with the four Skeltons to murder the said Robert C. Ross. If the respondent was not an accessory before the fact to the killing of Ross, he is not guilty of any crime alleged in the information. He either conspired with the four named Skeltons to murder Ross, or he had nothing to do with his death, and should be acquitted.

An accomplice is a person who knowingly, voluntarily and with common intent with the principal unites in the commission of a crime.—*Tanner v. State*, 92 Ala. 1; Wharton's Crim. Ev., § 440. There can be no pretention that the defendant united in the commission of any offense; he did no act that aided, abetted or encouraged the Skeltons in doing anything they did. The telegram had nothing whatever to do with bringing about the death of Ross. In no way did it aid in the killing. It was not instrumental in causing delay in the delivery of the message of E. H. Ross to the man slain, in no way facilitated the pursuit by the Skeltons. In this case, if there be a previously formed purpose or conspiracy to commit the offense, the acts, declarations and conduct of each conspirator done or expressed in promotion or in relation to the accomplishment of the crime, becomes the act, declaration or conduct of each co-conspirator, and may be given in evidence against him. But to do this, a *prima facie* case of conspiracy must be shown.—*McAnally v. State*, 74 Ala. 16. A *prima facie* case or evidence is that which is received or continues until the contrary is shown.—19 Amer. & Eng. Encyc. of Law, 83; *Troy v. Evans*, 97 U. S. 3; *Kelly v. Jackson*, 6 Pet. (U. S.) 622; Wharton's Crim. Ev., § 698, and note 2. The respondent is charged with being an

accessory to a crime. It must appear that the crime was in fact committed.—*Poston v. State*, 12 Tex. App. 408. There is no *prima facie* case made, there is no conspiracy, and the evidence as to all that the Skeltons did and said should be excluded.—*McAnally's Case, supra.*

An accessory before the fact, as charged in this information, is one who, being absent at the time the crime is committed, yet procured, counselled or commanded another to commit it.—1 Amer. & Eng. Encyc. of Law, 61, also page 67, and note, *Hughes v. State*, 75 Ala. 31; *Griffith v. State*, 90 Ala. 583; 1 Amer. & Eng. Encyc. of Law, 452 and note 3. There is absolutely no evidence in this case that the respondent "procured" the Skeltons to commit the deed charged, or that he counselled it or commanded it.

The mere passive non-interference does not render one guilty of a crime committed by others.—3 Coke 529, and note; *Jackson v. State*, 20 Tex. App. 190; *Mulvey v. State*, 43 Ala. 316. Mere approving a murder committed in one's presence or within one's knowledge does not make him an accessory or an accomplice.—Wharton's Crim. Ev., 440; *State v. Cox*, 65 Mo. 29; 1 Amer. & Eng. Encyc. of Law, 62, and note 1; *Connaughty v. State*, 1 Wis. 169; *People v. Woodard*, 45 Cal. 293; 13 Amer. Rep. 176 and notes; *White v. People*, 81 Ill. 333; *Cooper v Johnson*, 81 Mo. 483; *Noftsinger v. State*, 7 Tex. App. 301; *Rucker v. State*, 7 Tex. App. 549; *State v. Hann*, 40 N. J. L. 228; *Ellizando v. State*, 30 S. W. Rep. 560

In order to make one an abettor it must be proven that he was in a situtation in which he not only rendered assistance in some manner in the commission of the offense, but it must be proven that he was in this position by agreement with the perpetrator of the crime, or with his previous knowledge, consenting to the crime, and for the purpose of rendering him encouragement in the commission of it.—*Knapp's Case*, 20 Amer. Dec. 504. Or to assist him by the doing of some act whereby the party who is regarded as the principal and is the principal actor in the commission of a crime is encouraged, or it is made easier for him to do the principal act or effect the primary purpose.—1 Amer. & Eng. Encyc. of Law, 453 and note; *Wiley v. McRee*, 2 Jones (N. C.) 349 *Raiford v. State*, 59 Ala. 106; *Griffith v. State*, 90 Ala. 588. To hold one liable with

others as principal in the commission of an offense, there must be combination of act and intent.—*Rountree v. State*, 10 Tex. App. 110. One is not gulty of aiding and abetting merely because present and seeing an offense committed, if he does not interfere. He must do or say something showing his consent and contributing to its execution.—*State v. Hayward* 10 Amer. Dec. 607, note. There must be some affirmative act or encouragement to make him guilty as an accomplice.—9 Amer. & Eng. Encyc of Law, 575.

If the telegram of the respondent to Huddleston, not being sent with the consent, knowledge or approval of the Skeltons, and not being addressed or directed to them, and not being delivered to them, nor brought to their knowledge, and being in no way interposed between the deceased and any means of escape which may have offered themselves to him, the telegram in no way contributed to, facilitated or brought about the death of Ross, and, therefore, the defendant is not guilty of any of the specifications in the information.—*Frank v. State*, 27 Ala. 37 ; *Jordan v. State*, 79 Ala. 12; *Turner v. State*, 97 Ala. 57; *Cabbell v. State*, 46 Ala. 195. In order to hold the respondent responsible as a participant in the crime, if crime it be, on the part of the Skeltons to have killed Ross, the State must show beyond a reasonable doubt that the act of the defendant in sending the telegram to Huddleston contributed to and facilitated the killing of Ross by said Skeltons. And that the act and conduct of the respondent was anticipated by or expected on the part of the Skeltons by reason of a previously formed arrangement or agreement between them and the respondent, that he would so act, or do other acts of a character calculated to aid and facilitate the killing of Ross.—*Hickam's Case*, 8 S. W. Rep. 252; 6 Criminal Law Magazine and Report, 414.

McCLELLAN, J.—The evidence was taken *ore tenus* in this case. There were many witnesses. Much difficulty and delay in securing their attendance at Montgomery were apprehended. To facilitate the hearing of the case and to subserve the convenience and necessities of the witnesses, the judges of this court, at the request and in accordance with the agreement of the respondent

[State ex rel. Attorney General v. Tally, Judge, &c.]

and the State consented to take the evidence and hear the arguments of counsel in the cause at Huntsville, near the scene of the acts and omissions laid against the respondent in the information. And the evidence was there taken, and the arguments were there heard. This, we were and are of opinion, we might well do at the request and in accordance with the agreement referred to, in view of the control which the statute gives respondents in such cases over the manner of taking testimony. But we were not unmindful of section 3, article IV of the constitution, which is in this language: "The Supreme Court shall be held at the seat of government, but if that shall become dangerous from any cause, it may adjourn to a different place;" and we were careful, while sitting at Huntsville as individual members of the court and not as the court itself, to avoid the attempted exercise of all judicial power. Hence it is that we made no rulings as to the admissibility of testimony except of a tentative and advisory nature, and hence it is also that much incompetent testimony was received subject to objections noted at the time, and is now to be striken out and excluded, either expressly or by tacitly disregarding it in reaching the conclusions we shall announce. This course, under the circumstances, the triers of the facts and the judges of the competency of proposed testimony being the same, and under a necessity for the most part to know what the offered testimony is before passing upon its admissibility, whether the ruling is to be presently or subsequently made, involved no prejudice to either party; and we believe facilitated the hearing in this instance.

Briefly stated, the information in this case contains two charges against John B. Tally as Judge of the Ninth Judicial Circuit. The first is willful neglect of duty while in office, in that, knowing the intent of Robert, John, James and Walter Skelton to take the life of R. C. Ross, and having the opportunity to intervene in his official capacity to prevent the execution of that intent, he willfully failed and neglected to do so. The second count charges complicity on the part of Tally in the murder of Ross, by the hands of said Skeltons. Tally was a brother-in-law to all of the Skeltons named except John, having married their sister who was a cousin to John. The

grievance they had against Ross lay in the fact that the latter had seduced or been criminally intimate with a sister of three of them and of Mrs. Tally. This abstract fact was, in our opinion, competent evidence in this case against Tally as tending to connect him with the motive which actuated the Skeltons to the killing of Ross; and the fact appears in this case by evidence to which no objection was interposed. Much evidence on this subject, including several letters written by Ross to Miss Skelton, was offered by the respondent, objected to by the State, and received subject to the objection because of the circumstances, to which we have adverted, under which the evidence was taken. All this must now yield to the objection noted at the time, and be excluded from the case. It was proved that both the Skeltons and Tally had full knowledge of the liaison between Ross and Miss Skelton—had had possession of and read all the implicatory letters from him to her—long before the killing of Ross. Had they, immediately upon the receipt of these letters and upon coming, in this or other way, to a knowledge of Ross's misconduct toward her, been moved by the tumult of passion, which the law holds such intelligence sufficient to provoke and engender, to take the life of Ross, and had taken his life while under the actual dominion of this overmastering passion before cooling time had elapsed, all this evidence would have been competent as negativing the premeditation and malice which are essential elements of murder, and thereby reducing the grade of their offense to manslaughter. But the amplest cooling time had elapsed. If their passion continued, it was without justification of law. And whether as a matter of fact life was taken in a passion so continuing. or not, the offense of the Skeltons, and of Tally, if he participated in the homicide, was and could be in nowise and to no extent or degree justified, mitigated or extenuated by the fact of Ross's relations with their sister; and they are each and all guilty or not of murder as the other and only evidence in the case, wholly apart from and exclusive of the relations of Ross and Miss Skelton, may or may not satisfy beyond a reasonable doubt minds charged with the investigation that they killed, or participated in the killing of, Ross under circumstances that would have imported murder had the perpetrators been wholly without griev-

ance, real or fancied, against him. All this testimony is, therefore, entirely irrelevant and immaterial to any issue that can possibly exist in this case, and it is excluded.—*Hooks v. State*, 99 Ala. 166; *McNeill v. State,* 15 So. Rep. 352, *infra.*

It has been many times decided by this court, and may now be considered the settled rule with us, though most of the adjudged cases in other jurisdictions hold the contrary, that a witness cannot depose to his uncommunicated intention. And upon this rule the testimony of the respondent as to the purpose and intention which actuated him in the sending of a certain telegram, and of the witness Huddleston that, upon receiving certain telegrams from E. H. Ross and the respondent on the morning of February 4, 1894, he "went down to the hotel to see if Mr. Ross was there—to see if he had come there; went down to advise with him and to see what the trouble was, and also to deliver the message," must now be stricken out.— *Wheless : v. Rhodes*, 70 Ala. 419; *Whizenant v. State*, 71 Ala. 383, *Stewart v. State*, 78 Ala. 436, *Fonville v. State*, 91 Ala. 39; *Baldwin v. Walker*, *Ib.* 428; *E. T. V. & G. R. R. Co. v Davis, Ib.* 615; *Lewis v. State*, 96 Ala. 6.

The conversation between the respondent and Mr. J. E. Brown after and on the day of the homicide was in the nature of privileged communications between attorney and client, for though that relation was never established between these parties, what was then said by the respondent was with a view to the retainer of Mr. Brown, and is within the protection of the rule. That conversation and the circumstances under which it was had must now be excluded.—*Hawes v. State*, 88 Ala. 37, 68. Without discussing at present other objections to testimony which may be ruled upon in the course of this opinion, we will proceed to state and consider the evidence with reference to the guilt or innocence of the respondent of the charges brought against him by the information, premising that we recognize the rule of conviction beyond a reasonable doubt as applicable to this case, and that our minds must be convinced to that degree of the guilt of the respondent before we can adjudge him guilty as charged.

Among the facts which the evidence establishes without conflict, direct or inferential, in this case, are the

following: About January 6, 1894, Ross left his home in Scottsboro surreptitiously under and because of an apprehension that his life was in imminent peril at the hands of the Skeltons. He remained away from Scottsboro under this apprehension until Tuesday night, January 30th, when he returned on account of the illness of his wife. From that time till Sunday, February 4th, he remained in Scottsboro, secluded in his house. About 6 o'clock on that Sunday morning, just as the train passed Scottsboro going to Stevenson and beyond there to Chattanooga, Ross left Scottsboro in a hack for Stevenson, eighteen miles distant, intending to catch a train there on another road and go on to Chattanooga. With him were his brother-in-law, Bloodwood, a negro man, John Calloway, and the driver, one Hammons. All of the party were armed; Ross had a gun and a pistol, Bloodwood had a gun, and Calloway and Hammons each had a pistol. They arrived in Stevenson about 10:45 that morning, and driving to a point in a public road or street midway between an hotel and the passenger station of the two railroads that connect, or, rather, unite there, and thirty or forty yards from each, all the party alighted from the vehicle, except the driver, and took out their arms and baggage, the latter consisting of three valises. A person, William Tally, passing at the time from the hotel to the station, walked around the hack, which had stopped immediately in front of him; and met, shook hands and passed the usual salutations with Ross, who had gotten out on the side next the station, and then turned away and started on toward the station. Just at this juncture a shot was fired at Bloodwood, from behind the depot platform. This was followed by another from the same place, and then by other shots from two guns behind the platform and from a pile of telegraph poles a little way down the road in the direction from which the hack had come. Some one or more of these succeeding shots took effect in Ross's legs, and he fell. Bloodwood was also wounded and ran away. The team ran away with Hammons. Calloway does not appear to have been hit, but in some way he fell with and under Ross. They both arose almost immediately. The negro, Calloway, ran away. Ross managed to get to the side of a small oil house, a

short distance beyond where the hack had stopped, and
took a position affording some shelter from persons be-
hind the platform and telegraph poles.   While standing
there with his gun in his hand and looking in the direc-
tion of the telegraph poles, a man came to the corner
of the house behind him and shot him with a Winches-
ter rifle through the head from back to front.   He fell
in the throes of death and died, then another man came
up from behind the platform and, approaching closely,
also shot him through the head with a Winchester rifle.
The man who fired the first and two or three other shots
from behind the platform was Robert Skelton.   The
man who fired the other shots from that position was
James Skelton.   The man who fired from the telegraph
poles was Walter Skelton.   John Skelton it was who
reached the corner of the oil house behind Ross, shot
him in the back of the head and killed him.   And it
was Robert who came up after he was dead, and again
shot him in the head.   Some of the Skeltons were seen
about the station in Scottsboro when the east bound
train passed that morning just at the time Ross started
overland to Stevenson.   Soon after that they heard of
Ross's flight, and, as soon as they could get together,
arm and mount themselves, they started in pursuit on
horseback.   They were fearful that Ross would turn off
the Stevenson road and go across the Tennessee river as
he had done on the occasion of his previous flight, and
hence they were afraid to take any short cuts by resort-
ing to which they could have, as Ross continued in the
Stevenson road, overtaken him much sooner than they
did ; but in their uncertainty as to his destination they
thought it best to follow the tracks of his vehicle.   Do-
ing so they came in sight, and within a little distance,
of the hack as it was crossing a creek a mile from Stev-
enson.   The hack was a close one and its occupants did
not see them.   A railroad crosses the creek at this point
along side of the public road.   They could have attack-
ed the Ross party at this point, and Walter Skelton
testifies that he then said to his companions :  ''Let's
surround them and demand of him where Annie is,''
but that they said :  ''No, that would probably bring
on a fight, and some one of us get killed.''   Instead of
this, Robert and James dismounted, left their horses
and ran along the railway track to Stevenson where
they arrived and took positions behind the platform

almost immediately after the Ross party had arrived and stopped. Walter and John Skelton kept in the road behind the hack and fifty or sixty yards distant from it. They too were afoot at this time. Walter stopped at the pile of telegraph poles which he seems to have reached about the time the hack stopped and before any one alighted from it. John, in some way, got beyond the hack and finally to the oil house without, so far as the evidence discloses, being seen by anybody until just before he shot and killed Ross. After the killing of Ross, Robert Skelton sent a telegram to the respondent at Scottsboro informing him that Ross was dead and that none of the Skeltons were hurt; and they all surrendered themselves to Huddleston, who was mayor of Stevenson, and were taken back to Scottsboro and confined in jail. Subsequently bail was allowed them, and was given by Robert and James. John and Walter were unable to give bail, and the former escaped, and is still at large. After this, Walter also gave bail. All these facts are undisputed. The evidence offered in justification or mitigation of the homicide, except the facts and circumstances of Ross's relations with Miss Annie Skelton, which we have excluded, is that of Robert Skelton as follows: "About the time that I got to the depot, between the depot and the hotel, Mr. Ross was at the buggy speaking with Bill Tally. I walked up and saw that. In a little while, I don't know how long, Mr. Bloodwood drew his gun up at me. I dodged down, and then fired at Bloodwood;" and of Walter Skelton: "I was, I suppose, fifty or sixty yards behind the hack [when it stopped], and I was watching to see who got out. I saw Mr. Ross get out, talking to some one. Then I saw Mr. Bloodwood get out, and in a few minutes I saw him raise his gun across the hack, then take it down, and about the same instant I heard a gun pop." The gun which Walter heard "pop" was that of Robert Skelton. Walter and James then joined in and Robert continued the fusilade. That Bloodwood did not shoot there is no reasonable doubt. That Ross or any other of his party fired a shot is not pretended. That Bloodwood snapped his gun in an effort to shoot there is some evidence, enough we will conclude to engender a reasonable doubt as to whether he did or not. But the conclusion that he attempted to shoot at Robert Skelton will not afford any

justification or excuse to the Skeltons or the respondent. They were in no danger from Bloodwood's gun. If they were in danger, a safe avenue of retreat was open to each of them. Had there been danger and had the opportunity of retreat been wanting, they yet could not invoke the doctrine of self-defense, because their danger resulted from their own wrongful and unlawful aggression. They were there to kill. It was Ross and Bloodwood and not they who were on the defensive. This conclusion can not be escaped even from their own standpoint. They say they pursued Ross to prevent his going to their sister and continuing criminal relations with her. How were they to do this ; how could they do it but in the effective way they did do it, by stopping Ross at once and forever in his tracks. That they contemplated this means, conceding their purpose was to prevent the coming together of Ross and Miss Skelton, is beyond all question. It is shown by their conversation at the creek, when they said Ross would fight and some of them would be killed if they approached him with reference to Miss Skelton, and they then desisted only because the place and surroundings were not opportune. It is shown by the disposition they made of themselves around but concealed from Ross at Stevenson and the instantaneous fire they opened on him as soon as they were in their places of ambush, when, had their purposes been less deadly, had any sort of parley with Ross been desired, either for the purpose of diverting him from their sister or of ascertaing from him her whereabouts, pacific means to that end were at hand in the person of William Tally, who had just spoken to Ross and was then coming directly towards the place of concealment of two of them, one of whom began the onslaught, and in the person of several other men then in and about the depot. Their purpose was to kill ; its wickedness was unrelieved by aught of legal justification or excuse. They did kill ; and their act was without any justification, mitigation or extenuation which the law knows or courts can allow to be looked to. It was murder.

What connection had the respondent with that murder? Was he, knowing the deadly intent of the Skeltons and their pursuit bent upon its execution, willfully neglectful of his duty as a magistrate in not exercising the power the law had clothed him with to stay their

hands? Or did he himself participate in the deed by commanding, directing, counselling or encouraging the Skeltons to its execution, or by aiding and abetting them in its commission? The evidence for the prosecution on these issues will be briefly stated. As has been seen, Judge Tally was the brother-in-law of Robert, James and Walter Skelton, and of Miss Annie Skelton, the wronged girl. It may be supposed, therefore, that he shared with the Skeltons, in some degree at least, the shame and mortification which had come upon them through Ross; and that the grievance against Ross was common to them all. It was shown that he knew all the facts known to the Skeltons and come to his knowledge of them soon after they did. They all lived in the same town with the intimacy usually incident to their relations. James Skelton lived with Judge Tally. On Friday before the Sunday of the homicide, Judge Tally returned to Scottsboro from Ft. Payne, where he had been holding court, by way of Chattanooga, Tennessee, and over the Memphis and Charleston railroad. On the train was Mr. Gregory, a lawyer of Scottsboro, who engaged Judge Tally in conversation. The latter spoke of some interesting murder cases that he had been trying at Ft. Payne, and in this connection Gregory remarked to him that he thought they would have one or more killings in Scottsboro in a very short time. "The Judge [to quote the witness] asked me why, and I told him that Ross had come back and that the Skelton boys were on the war path, or some such thing, I don't remember just what it was. The Judge said he guessed not, that he supposed Ross would leave, or would not stay there, or something of that kind; and I told him I supposed so." On Saturday afternoon Judge Tally was in consultation with Robert Skelton, the eldest of the brothers, for something like a half hour in the latter's office. It is admitted by Judge Tally that this conversation had relation to Ross and Miss Skelton and the scandal connected with them. Tally staid at home that night. James Skelton also slept there. The next morning Tally's fifteen year old son went to a livery stable and got a horse, the hire of which was charged to, and subsequently paid by, Judge Tally. This horse was gotten for the purpose of being ridden and was ridden by Walter Skelton in pursuit of Ross. One witness testifies

that quite early on that Sunday morning before the
Skeltons had assembled to go in pursuit of Ross, he saw
a man whom he took to be Judge Tally passing a street
some distance from Judge Tally's house, going in the
direction of John Skelton's, but he was by no means
sure that the man he saw was Judge Tally.   J. D. Snod-
grass, a witness for the State, testified that he saw three
of the Skeltons, Robert, John and James, leaving Scotts-
boro that Sunday morning.   When he first saw them,
John and James were going along a side street upon
which Judge Tally's barn and barn lot were situated.
That the two last named had gotten beyond Tally's prem-
ises and were about turning out of this street, which ran
north and south, into a street running east and west and
passed in front of Judge Tally's residence.   This resi-
dence was the second from the corner at the intersection
of these streets.   At this time Robert Skelton was on
horseback near Tally's barn lot fence talking with Tally.
He remained there only a very short time—the witness
said probably a minute—after Snodgrass saw them.
Tally was either inside his lot or in the street near his
lot and on foot.   At the end of this short time Robert
rode on following John and James, turned east on the
other street mentioned and passed by Snodgrass's house,
which fronted on that street, going in the direction of
Stevenson.   He then observed that each of them had a
gun.   Another witness before this saw Walter Skelton
following the Stevenson road on foot.   This witness
coming on down this street in front of Judge Tally's
house, saw Tally standing at his front gate looking in
the direction Walter Skelton was proceeding.   Tally
turned before he reached him and went into the house.
Young Tally carried the horse which he had gotten
from the livery stable to Walter on the road.   Another
witness passed down this street after they had all gone
towards Stevenson, and he also saw Tally at his gate
looking in that direction.   Tally again turned and went
into his house before this witness reached him.   It was
also in evidence that James Skelton left Tally's house
that morning before breakfast, went down town, armed
and mounted himself, came back to Tally's, hitched his
horse in front of the house, set his gun against the front
gate, went into the dining room to get something to eat
before starting, then went out, remounted, and joined

Robert and John at the corner where these three were seen by Snodgrass. The flight of Ross and the pursuit of the Skeltons at once became generally known in the town of Scottsboro, and was well nigh the sole topic of conversation that Sunday morning. Everybody knew it. Everybody talked only about it. Everybody was impressed with the probability of a terrible tragedy to be enacted on the road to Stevenson, or at the latter point. The respondent was soon abroad. He went to the depot where the telegraph office was. He remained about there most of that morning. About nine o'clock that morning Dr. Rorex saw him there, and this, in the language of the witness, passed between them : "I said to Judge Tally that I thought we had better send a hack and a physician to their assistance up the road [referring to the Ross and Skelton parties then on the road to Stevenson] ; that these parties might get hurt and they might need assistance. Judge Tally replied that his folks or friends could take care of themselves. I also said to him that I reckoned we ought to send a telegram to Stevenson and have all of them arrested, to which he made no reply. * * He said that he was waiting to see if anybody sent a telegram—or words to that effect—waiting or watching to see if anybody sent a telegram." And he did wait and watch. He was seen there by Judge Bridges just before the passenger train going west at 10 :17 passed. He was there after it passed. E. H. Ross, a kinsman of the Ross who had fled and was being pursued, meeting the telegraph operator, Whitner, at the passenger station walked with him down to the freight depot where the telegraph office was. Judge Tally followed them. They went into the telegraph office and so did he. Ross was sitting at a table writing a message. It was addressed to R. C. Ross, Stevenson, Alabama. Its contents were : "Four men on horse back with guns following. Look out." Ross handed it to the operator to be sent. Tally either saw this message or in some way very accurately divined its contents. He called for paper and immediately wrote a message himself. Judge Bridges was still in the office. At this juncture Tally spoke to him, took him into a corner of the room and, calling him by his given name, said : "What do you reckon that fellow [the

operator] would think if I told him I should put him out of that office before he should send that message?" referring to the message quoted above which E. H. Ross had just given the operator. Judge Bridges replied: "Judge, I wouldn't do that. That might cause you very serious trouble, and besides that might cause the young man to lose his position with the company he is working for." Judge Tally then remarked: "I don't want him to send the message he has, and I am going to send this one." He then showed Judge Bridges a message addressed to William Huddleston at Stevenson, containing these words: "Do not let the party warned get away." This message was signed by Tally. Huddleston was the operator at Stevenson and a friend of Tally. The respondent then handed this telegram to the operator, remarked to him "this message has something to do with that one you just received," said he wanted it sent, and paid for it. He then started toward the door, but turned to the operator and said: "Just add to that message, 'say nothing.'" Tally then left the office. This message was sent just after that of E. H. Ross to R. C. Ross. The original of it was placed on a file in the office at Scottsboro. Two days after a search was made for it and it could not be found, and has never been found. The one man in the world most interested in its destruction, the respondent in this case, in the meantime had had an opportunity to abstract it, he having had access to this file and gone through the messages on it for the purpose, he said then and says now, of finding the address of a person to whom he had sent a message some days before. And on the preliminary examination of the Skeltons before the probate judge of Jackson county for the murder of Ross, Judge Tally was called and examined as a witness for them, and before a copy of this message was produced by the operator, and hence at a time when Judge Tally was not aware that a copy was in existence, this question was put to him: "You didn't send any dispatches that morning to Stevenson?" And his answer was: "Yes, sir. I sent one, but not about this matter. It was to a friend, about another matter, nothing concerning this case." And this friend was Mr. Huddleston. He further testified on that trial that he did not know Ed. Ross, did not see him going to the telegraph office that morning, and did not know whether Ed. Ross was in the telegraph office while he was on that

44          SUPREME COURT          [Nov. Term,

[State ex rel. Attorney General v. Tally, Judge, &c.]

occasion or not. These telegrams of Ed. Ross and Tally were sent about 10:25 A. M. Tally then, his watch to prevent the sending or delivery of a telegram to R. C. Ross being over, went home. Soon after eleven o'clock the message before referred to came from Stevenson to Scottsboro, addressed to Judge Tally, and signed by Robert Skelton. It ran: ''Ross dead, none of us hurt.'' This was taken to Judge Tally's house and there delivered to him, and he thereupon went to see Mr. Brown, and had the conversation which we have excluded.

The foregoing is substantially the case made by the evidence adduced by the State against the respondent, leaving out of view for the moment the evidence touching the effect which his message to Huddleston had upon occurrences at Stevenson.

Next we undertake a summary of the evidence for the defense. Judge Tally himself, and Robert, James and Walter Skelton were among the witnesses examined. The respondent admitted having a conversation on the train with Mr. Gregory, but he did not recall that Gregory said anything about the Skeltons being on the war path. He says he knew of the relations between Ross and Miss Skelton soon after the Skeltons were informed of them, and read the letters from him to her soon after they came to their possession. That he and Robert Skelton, at the time the latter showed him the letters, on January 6, 1894, held consultation as to what was best to be done in the matter. This is his account of what occurred and was said at that time in Robert Skelton's office: ''I asked Bob Skelton if he had such communications as it was reported he had, letters said to have been written by Mr. Ross to Annie. I asked him then if he would let me see the letters. He said he would; and got them and showed them to me, and I read them there in his office. He and his brother David Skelton and myself were the only persons present. During the time I was reading the letters we were speaking about the contents and discussing them, and he told me after I had read the letters—possibly during the time I was reading them—he gave me his ideas as to managing the trouble. He told me about his plans to get Annie home and to let Mr. Ross leave and make the best of it—let it die out and make the best of it. I told him that was decidedly the best thing to do. It

was best for him and would possibly save the publication generally of the scandal, and might possibly save my mother's life. Annie's mother was paralyzed and helpless, and I suggested that exposure might possibly cost her her mother's life. Dave Skelton was sitting by and observing our conversation, and would occasionally have something to say; and he spoke of doing violence—spoke of killing him. I simply turned to him and said : 'Dave, that won't do. This is the best management.' I desire to say just here that this is the only time that any member of the Skelton family ever said anything in my hearing about killing Ross. Not long after that, he left and I heard no further conversation about any violence." The respondent gives the following account of the conference he had with Robert Skelton on Saturday afternoon preceding the homicide : "I think I was on the street and Bob called me into his office, * * * and we engaged in conversation. I think that the first thing Bob mentioned to me was that he was thinking as to how he should find out where Annie was. He said he had been thinking about trying to get some one to go to Mr. Ross, and induce him or ask him to tell us where Annie was. I suggested to him the propriety of interviewing Mr. Brown about that, and gave him reasons why I suggested Mr. Brown." These reasons as given at the time by the witness he then repeats ; and goes on to mention one or two other persons whose availability in getting this information was discussed, and says that after this he left Bob's office having been there he supposes fifteen or twenty minutes. In all this Judge Tally is corroborated by the evidence of Robert Skelton, and, in respect of their determination to do no violence to Ross, but to get the girl home and allow him to leave Scottsboro, he is further corroborated by the declaration proved by Mr. Gregory in substance that no violence would be done to Ross as he would leave Scottsboro. He denies having passed up the street when the witness Miller says he thought he saw him at an early hour Sunday morning, and no importance can be attached to the evidence of that witness, because, in the first place, his glance at the man was casual and hasty and he was himself not at all certain that it was Judge Tally he saw. In the next place, even on the theory of the prosecution, there was no reasonable occasion for Judge Tally's being at that

place at that time, and, finally, the fact is denied on oath by the respondent. So that testimony may stand out of the case. In respect of the horse which Judge Tally's son procured at the livery stable, which was charged to and paid for by the respondent, and which Walter Skelton rode in pursuit of Ross, the testimony is that Mrs. Tally at the instance of Walter Skelton ordered this horse and sent her son for it, that she was in the habit of doing this, that it was charged to Judge Tally as was the custom, and that he, conceiving himself under a moral and legal obligation to do so because the horse had been supplied to Mrs. Tally, paid the bill, and this in the usual course, after the point now made on those facts had been suggested to him. The respondent admits on the stand that he saw and had a few words with Robert Skelton when the Skeltons were leaving Scottsboro Sunday morning as testified to by Mr. Snodgrass, and this is his account of that interview: "When I first got up, I went down stairs and stepped out to the front gate just a minute. The only person I saw was Bob Skelton riding up the street towards the railroad, [a street running north and south and not in the direction of Stevenson]. Bob was crossing the street going northwest, [the direction in which John Skelton lived]. I walked back through the hall of my house and went down into the garden to the closet, and was there some time, I don't remember how long, some little time however. After I came out of the closet and while I was in the garden I saw Bob and John Skelton riding away going east on the street parallel with the railroad, [and which ran back of Judge Tally's residence]. I staid there and observed them and saw them after they had passed the barn of Mr. Harris on the corner. I saw them coming on the street south passing my barn—along the street that runs in front of my barn. When I saw them going in that direction I walked through my barn lot to the fence and saw them at the corner, [the intersection of this south and north street passing Tally's barn with the east and west street upon which his residence fronts]. About that time Jim Skelton joined them. I didn't notice where he came from. Then I called to Bob Skelton. He turned and rode back from where I saw them at the corner, * * * and I crossed the fence and met him near the corner of my

barn lot. He rode up within six or eight or ten feet, and I said to him: 'Bob, where are you going?' He said to me: 'Going up the road.' I asked him again: 'Where are you going?' and he answered: 'Up the road, and I am in a hurry.' He turned and rode off, went back the way he came when I called to him.'' Robert Skelton's testimony agrees with Judge Tally's fully as to this interview, only he added that he said further to Tally that he was in a hurry and did not want to talk. And they are both fully corroborated as to the circumstances under which this interview was had, its brevity and how it was brought about, by Mr. Shelley, an wholly disinterested witness, who saw John and Robert Skelton as they rode along the east and west street back of Judge Tally's premises—they passed the witness there—saw them turn south on the street in front of Judge Tally's barn, and proceed along that street beyond the point of the interview between Tally and Robert Skelton, then saw the latter riding back to where Tally was, sit there on his horse while the witness could have counted fifteen or twenty, then turn, rejoin the others and ride out east. And there is nothing in this account of this interview which materially conflicts with that given by J. D. Snodgrass. James Skelton, as has been said, lived at Judge Tally's. He slept there the night before the homicide and went thence, as we have seen, in pursuit of Ross. Judge swears he did not see him that morning except when he joined Robert and John at the corner about the time of the conversation between Robert and himself. It is shown by the evidence of Mr. Proctor, who slept with James the night before, that the latter arose and left the room quite early that morning. It was also shown that he was down town at an early hour. Judge Tally must have arisen after James went down town. The testimony and all the circumstances concur in showing that when James came back to the house, mounted and armed, and went in to get ''a piece of meat and bread,'' as he expressed it, leaving his gun and horse at or near the front gate, Judge Tally was either in his garden back of his house, or more probably in his barn yard, which was back of an adjoining house. From neither of these positions could he see the horse or gun at the front, or James in the house. Judge Tally also testifies that he did not see

Walter Skelton at all that morning, or know of his son's going for a horse for him until the Skelton party had left Scottsboro. This is somewhat strange in view of the facts that Walter Skelton came to his house that morning, talked with Mrs. Tally, and induced her to procure a horse for him to ride in pursuit of Ross, and that young Tally was sent from the house to the livery stable for the horse. But it reasonably appears from the evidence that all this happened before Judge Tally got up. It is shown that Mrs. Tally's cook was sick and that she had to be up early to prepare breakfast, and did get up some time before Judge Tally. And the other testimony and the surrounding circumstances concur in showing that all that occurred at Judge Tally's house with reference to this horse occurred in the interval between the times Judge and Mrs. Tally arose.

The respondent further testifies that he did not see his wife after she arose that morning until he returned to the house from the barn lot where he had the interview with Robert Skelton; that he returned thence to his house, saw his wife and she then told him of the flight of Ross, which had been communicated to her by Walter Skelton, and of the pursuit of the Skeltons; and that he did not know and had received no information before this that Ross had gone, and that the Skeltons were pursuing him. At this juncture, it is to be borne in mind, all the Skeltons had left Scottsboro. And this, with proof of the respondent's good character, is the case of the defense so far as the first count of the information is concerned. On the evidence for the State which we here set out, taken in connection with this evidence for the respondent, can it be said that Judge Tally, when he was in the presence of Robert, and in sight of John and James Skelton that morning, knew of their intention to take the life of Ross, and that they were setting out to presently execute that intention as is charged in the several specifications under the first count? We think not. There is no affirmative evidence, such as declarations and the like on their part might have afforded, that they themselves ever entertained the purpose to take life prior to that morning except in the event Ross failed and refused to leave Scottsboro. And they might well have entertained such purpose without Tally's knowl-

edge of it.   It might well have been that, intending to
kill Ross, the Skeltons would have concealed their de-
sign from Tally on account of his official position and
notwithstanding his family relations with them.   Again,
there is no positive evidence, if they so intended prior to
the day of the homicide, that Tally was ever informed
or knew of their intention.    True it may be said that he
knew Ross had to leave there, and failing this the Skel-
tons would, or intended to, kill him ; but only knowing
this, the fact that Ross had gone, which fact according
to the State's theory he must have known when the
Skeltons left Scottsboro, it would have been but natural
for him to have concluded, that as the condition upon
which Ross was to live had been met, the conditional
purpose to take his life was abandoned.    True it is also
that he had in some degree the same motive to destroy
Ross that moved the Skeltons to his destruction in the
sense that he, too, by reason of his marital relations,
was a victim of the wrong that Ross had wrought upon
them all; but this motive might well have impelled
the Skeltons to the extreme to which they went in
purpose and deed, while he was restrained by that re-
spect for law which his profession engenders, and by
the environment of his high judicial position, from
yielding in intent or action to the deadly impulse the
wrong was conducive to.    There is, we repeat, no
affirmative evidence that Judge Tally knew, until after
the Skeltons had gone, that they intended to take the
life of Ross.    There were circumstances proved which
unexplained might have justified—indeed would have
justified—the inference that he did.    But explanations
have been made which are either affirmatively satis-
factory, or cast such reasonable doubt on the conclu-
sions to which without the explanations the circum-
stances would have led us, that we do not feel justi-
fied in adopting the conclusions.    For instance, the
hiring of the horse which Walter rode :   As presented
by the State in all its baldness that fact was most in-
criminating.    But when taken in connection with the
facts that the horse was to serve an occasion which was
born of the flight of Ross while Tally slept, and was
subserved by the procurement of the horse before he
arose, that it was charged to him because ordered by
his wife and paid for by him, after the circumstances

4

of the hiring and use of the animal had been used in the public mind to connect him with the tragedy, because by the course of previous dealing between him and the livery-man in respect of orders by his wife he was under both a moral and a legal obligation to pay, its probative force against him is utterly destroyed. The presence that morning at his house of Walter Skelton is a circumstance of suspicion and would be of incrimination, but for the fact, which is shown by other evidence than Tally's, and against which nothing has been offered affording a contrary inference even, that Walter had come and gone before Tally got out of bed in an upstairs room. Again, the naked fact that James came there after Tally had arisen, armed and mounted has of course a natural tendency to show that Tally knew the purpose of such unwonted and warlike preparations on that day when to ride about the country with guns is such an unusual thing. But according to the testimony, not only of Tally and Robert Skelton, but also of Mr. Shelley, a witness for the defense, and of Mr. Snodgrass, a witness for the State, the respondent was at that time in his barn lot, or next it in the side street, from which point he could see neither Walter Skelton in the house, nor his gun standing against the front gate, nor his horse hitched in the street in front of the house and gate. The presence of Tally with Robert Skelton in the street near the former's barn as the Skeltons were starting on their chase of Ross, standing alone and unqualified, might prove much against him. But the evidence of himself and Robert Skelton, taken with that of Mr. Shelley, a disinterested witness, satisfies us that that meeting was momentary and wholly casual. Skelton had passed Tally and was proceeding on his journey when Tally hailed him and had him come back. Clearly he had not come that way to see Tally. It is not pretended that they had met before on that morning, or had any communication after Ross's flight. Tally's being there is reasonably accounted for without connecting his presence in any way with this Ross matter. Skelton's passing there was reasonable without any reference to Tally; it was his route to his destination. They were together about long enough for the words they give to have passed between them. They

were not together long enough, we should say, for such conversation as would naturally have passed had they been discussing the flight and pursuit of Ross, what the Skeltons intended to do, what Tally should do meantime at Scottsboro, and the like. The State's witness, Mr. Snodgrass, saw them there, and his evidence does not materially conflict with that of Shelley as to the length of time they were together. We have already stated the conversation they had as testified to by Tally and Skelton. Though they are to the last degree interested witnesses, there is nothing before us which would justify our reaching the conclusion with the necessary conviction of mind that aught was said other than the words they have deposed to. Moreover, it does not appear, but the contrary does appear upon all the evidence we have, much of which is not tainted by interest, that Tally had any information of Ross's flight when he was talking with Robert Skelton. It is clearly shown that James Skelton did not know it, indeed it had not transpired, when he left the house. It came first to the knowledge of Walter, and it may well be supposed that he and James and all of them made their preparations with all possible expedition, losing no time to hunt up and inform Tally. Walter and James were at Tally's house after they knew of it, but there is no evidence that Tally saw either of them. Tally's own and Walter's evidence that they did not see each other and proof of circumstances demonstrate that he did not see James until he was riding away. It is said that Tally must be held to have known the intention of the Skeltons to pursue and kill Ross from seeing Robert and John mounted and armed. How could he know this, how are we to be justified in holding that he knew this when it is clearly shown that he did not know Ross had gone at all? And had he known that, how could he justify a conclusion that they were .going to pursue and slay him as he left Scottsboro, when, according to all the evidence we have as to Tally's knowledge of their intentions, they all wanted him to leave Scottsboro and intended he should go in peace. Again, shall the inference of a murderous intent on Tally's part, or of his knowledge of such intent on the part of the Skeltons, be drawn from the mere fact that he was seen on two occasions talking with his brother-in-law in the latter's

office for half an hour? Obviously not. Shall the fact that one of these occasions was the day before the killing of Ross lead us to say that Tally knew the Skeltons intended to kill? Of course not. And even less, if possible, would such conclusions be justified when we consider that the only evidence of what passed in these conversations was to the effect, whatever else it may have imported, that Ross should not be killed if he did what he was manifestly trying to do when he was killed; leave Scottsboro.

Some other minor circumstances, really of no probative force—such as that Tally was seen at his front gate that morning, once before and once after the Skeltons had gone, that he saw Robert Skelton riding north on a street some distance from him, which fact he brought out himself, and the like—were put in evidence. These we will not stop to discuss. Nor do we deem it necessary to discuss in this connection—with reference to Tally's knowledge of the Skeltons' intent when he had the brief interview with Robert that morning—Judge Tally's conduct after the Skeltons had gone. That conduct is referable to the knowledge he *then* had, which had been first imparted to him by his wife, and which soon became the common knowledge of the town, that the Skeltons had gone in pursuit of Ross to kill him; and in our opinion what he did and said after that time will not serve to establish the *scienter* laid under the first count of the information. We conclude this part of the case by saying that we do not find that Judge Tally had any knowledge of the intention of the Skeltons to kill Ross before or at the time of their departure in pursuit of him, that, therefore, neither of the three specifications under the first count is proved, and we find him not guilty of the charge of willful neglect of official duty presented by that count.

The second count of the information charges that "John B. Tally, Judge of the Ninth Judicial Circuit of the State of Alabama, unmindful of the duties of his said office, was, before the filing of said report of said grand jury, and while in such office, guilty of an offense involving moral turpitude, to-wit, the offense of murder." There are three specifications under this charge. The averments, among others, of the first specification, following averments of Ross's flight, the Skelton's pursuit and the killing of Ross by them at Stevenson with

malice, &c., are, "that said Tally was informed of the
intention and purpose of the said Skeltons to unlawfully
take the life of the said Ross, and said Tally held com-
munications with said Skeltons touching their said pur-
pose, and said Tally knew of the pursuit of said Ross by
the said Skeltons as aforesaid, and had such knowledge
at the time said Skeltons were making ready to set out
in pursuit of said Ross, and at the time they did set out
in such pursuit." As we have already indicated we are
not convinced of the truth of these averments, and as the
other matters laid in this specification may be considered
as well under the second and third specifications, we
will direct our attention solely to them. The second
specification charges that the Skeltons "unlawfully and
with malice aforethought killed Robert C. Ross by shoot-
ing him with a gun," and "that the said John B. Tally,
before the said felony and murder was committed, in
manner and form aforesaid, on the day aforesaid and in
the county and State aforesaid, did aid or abet the said"
Skeltons, naming them, "in the commission of the said
felony and murder." And the third specification charges
"that on Sunday, the 4th day of February, 1894, in the
county of Jackson, State of Alabama, the said John B.
Tally unlawfully and with malice aforethought killed
Robert C. Ross by shooting him with a gun." These
charges of aiding or abetting murder and of murder di-
rect, which amount to the same thing under our statute,
(Code, § 3704), are, upon considerations, to which we
have already adverted, to be sustained, if at all, by evi-
dence of the respondent's connection with the homicide
after the Skeltons had left Scottsboro in pursuit of Ross,
since we do not find any incriminating connection up to
that point of time. Being without conviction that Tally
knew of the Skeltons' intention to take Ross's life until
after they had departed on their errand of death, and
there being no evidence or pretense that between this
time and the homicide any communication passed be-
tween them and Tally, we reach and declare the con-
clusion that the respondent did not command, direct,
counsel, instigate or encourage the Skeltons to take the
life of Ross, and that in whatever and all that was done
by them and him, respectively, there was no understand-
ing, preconcert or conspiracy between them and him.
    This narrows the issues to three inquiries—two of

fact, and one of law : *First*—a question of fact—Did Judge Tally on Sunday, February 4, 1894, knowing the intention of the Skeltons to take the life of Ross, and after they had gone in pursuit of him, do any act intended to further their design and aid them in the taking of his life? If he did, then, *second*—a question of law— Is it essential to his guilt that his act should have contributed to the effectuation of their design—to the death of Ross? And if so, *third*—another inquiry of fact—Did his act contribute to the death of Ross?

There can be no reasonable doubt that Judge Tally knew soon after the Skeltons had departed that they had gone in pursuit of Ross, and that they intended to take his life. Within a few minutes he was informed by his wife that Ross had fled and that the four Skeltons were pursuing him. He had seen three of them mounted and heavily armed. He knew the fourth, even keener on the trail than these, had gone on before. He knew their grievance. The fact that they intended to wreak vengeance in the way they did upon overtaking Ross, was known to all men in Scottsboro, as soon as the flight and pursuit became known. It was in the minds and on the tongues of everybody there. Nothing else was thought or talked of. When Dr. Rorex, voicing the universal apprehension, suggested to him that aid be sent up the road to the dead and wounded, Judge Tally, taking in the full force of the implication that there would be a fight to the death with the Skeltons as assailants, and not dissenting therefrom at all, said with the ken of prophesy, as a reason why he would not be a party to the execution of this humane suggestion, that his folks—the Skeltons—would take care of themselves. How well they took care of themselves—with what exceeding care they conserved their own safety—is shown by the event and the manner in which it was produced. To the other suggestion of Dr. Rorex, resulting from the universal knowledge that unless something was done an awful tragedy would be enacted, that "we telegraph to Stevenson and have them all arrested," and thus prevent the catastrophe, if perchance Ross should reach that point alive, Judge Tally made no direct response ; but in the same connection he said : "I am waiting and watching here to see if anybody sends a telegram." What he meant by this is most clearly demonstrated by his subse-

quent shadowing and following up Ed. Ross, and his conversation with Judge Bridges about putting the operator out of the office before he should send Ed. Ross's message of warning to his kinsman, Robert C. Ross. This was the situation : Ross was in what he supposed to be secret flight from the Skeltons. He was unaware that his early departure had been seen by one of them. He did not know they were all in full pursuit to take his life. Under these circumstances, the pursuers had every advantage of the pursued. They could come upon him unawares. Being on horse back while he was in a vehicle, coming up to him they could well get beyond and waylay him. This they actually did. Having this tremendous advantage, accentuated by the fact that they were in no danger from Ross even if he saw them unless he was forced to defend himself—that his effort and intent were to get away and not to kill—Judge Tally might well feel satisfied with the posture of affairs, he might well feel assured that his folks would take care of themselves, as they did. All he wanted was that this situation, which portended the death of Ross and the safety of his folks, should not be changed. He would not agree that it should be changed so as to save Ross's life even though at the same time the safety of the Skeltons should be assured, as would have been the result had the authorities at Stevenson been fully advised at the time Dr. Rorex suggested the sending of a telegram there to arrest all parties. He was waiting and watching there to see that the situation was not changed by advice to Ross which would or might enable him to escape death at the hands of his folks. He waited long and watched faithfully, and his patience and vigil were rewarded. He saw Ed. Ross going toward the telegraph office. He at once concluded Ross was going there to warn his kinsman and give him a chance for his life. He followed. His purpose was to stop the message, not to let the warning even start on its journey. This he proposed to do by overawing the operator, a mere youth, or by brute force. Judge Bridges dissuaded him from this course, but he adopted another to destroy this one precarious chance of life which was being held out to Robert C. Ross. It would not do, Bridges advised him, to stop the warning by threatening or overpowering the opera-

tor. The young man was a new comer and a stranger there, and a resort to moral suasion with him was therefore unpromising and hazardous. Not so with the operator at the other end of the line. He was Judge Tally's friend of long standing. He, through whose hands Ed. Ross's message of warning was intended to pass, could be approached. And to him Tally addressed himself. Saying to Judge Bridges that he, the Scottsboro operator had a message which he, Tally, did not want sent, and which, under Judge Bridges' advice, Tally had concluded not to stop by threat or force; he adopted another means of stopping it short of the person to whom it was addressed. He telegraphed his friend, the operator at Stevenson, not to let Ross get away. His language was at first written: ''Do not let party warned get away.'' This he handed to the operator to be sent to Stevenson, saying: ''This message has something to do with the one you have,'' referring to Ed. Ross's message. What then passed through his mind we are left to conjecture; but upon further thought he added to the message these words: ''Say nothing.'' What was the full import of this completed message, looking at its terms and the circumstances under which it was sent? One thing is most clear, from all the circumstances and upon the words themselves and in the light of those circumstances. The message beyond all question would never have been sent but for the sending of Ed. Ross's message. It was manifestly and confessedly the offspring of a purpose to thwart the efforts of Ed. Ross to warn his kinsman of the true situation. One element of this situation, which gave Judge Tally great satisfaction with it, was Robert Ross's utter ignorance of the danger he was in. He scouted all suggestions to interfere at all so long as this element of gravest peril to Ross and of assured safety to the Skeltons existed. It was to the end that this element of peril to the one and safety to the other party should not be eliminated that he had waited and watched all morning to see if anybody attempted to eliminate it by advising the hunted of the oncoming, in deadly purpose, of the hunters, and to prevent by threats or force or in any other possible way the sending of a telegram to advise Ross of this important factor in the posture of affairs with which he had to deal on the hazard of his life. At the last moment the idea

of resorting to threats and force was abandoned as unwise. There was no other way to stop the telegram in the Scottsboro office. It was therefore to go, and the only other way to prevent its reaching Ross was to have it stopped at the Stevenson office. Tally, being dissuaded from the former course, adopted the latter. His purpose was the same throughout, but there was a change in the means he had contemplated for its effectuation. Whitner, the newcomer and stranger, could not be prevented or dissuaded from putting the message on the wire, but Huddleston, the lifelong friend, who was to take it off the wire, and whose duty it was to deliver it to Ross, might be commanded or persuaded to omit its delivery when he had taken it from the wire— to "say nothing." And in that event Ross would remain in ignorance of his danger, the situation, which gave Judge Tally so much satisfaction as that he felt assured his folks could take care of themselves, and which he would not consent to interfere with as suggested by Rorex in a way to conserve the safety of both the Ross and Skelton parties, would remain unchanged, and Ross would go to his death, as he did, without a single chance to raise his hand in defense of his life. The telegram to Ross was: "Four men on horseback with guns following. Look out." Tally's telegram to Huddleston was: "Do not let party warned get away. Say nothing." "Get away" from what or from whom? From whom indeed and in all common sense but from the four men on horseback following with guns to take his life. They alone were in pursuit. They only were following the party warned. From them alone was Ross fleeing. From them only, by what he supposed to be secret flight across the country rather than attempt to board a train guarded by them against him, was he trying to get away. The law had no claim upon him; he had committed no offense of which it took cognizance, and no charge of crime had ever been made against him. Nobody on earth except the four men, the Skeltons, sought to prevent his getting away; and from these Judge Tally, seeing that a chance of escape was about to be afforded him, called upon his friend, Huddleston, to interpose, to destroy that chance and to prevent his getting away. Having formulated his command or request to Huddleston to prevent his getting away and

handed it to Whitner for transmission to Huddleston, the
thought must have passed through his mind : ''How is
my command or request to be complied with ; how is
Huddleston to prevent Ross's getting away.'' He knew
there was no ground to arrest Ross. He knew that
Huddleston, although mayor of Stevenson, was utterly
without authority or right to stay him for one moment
of time. How then was he to proceed? One obvious
means to this end presented itself to the respondent's
comprehension as he pondered how the thing he want-
ed to be done could be accomplished. That was that
Ross should not be advised of the contents of the dis-
patch of warning. This would maintain the *status quo*
with which Judge Tally had evinced such complaisance
and satisfaction, in which his ''folks could take care of
themselves,'' and out of which must result the
death of Ross. And to suggest this effective
means to his friend he makes Whitner, who
then has the original message in his possession
add to it the words : ''Say nothing.'' Say nothing
about what? Clearly about the subject matter of the
two dispatches, nothing about the pursuit of the four
men on horseback with guns, nothing about the warn-
ing to Ross. Say nothing so that the situation may re-
main unchanged. Say nothing so that Ross shall con-
tinue to be, as he is now, without the chance or hope of
escape. In other words and in short, the substance and
effect of what Tally said to Huddleston, taking the two
dispatches and all the circumstances into the account,
was simply this, no more or less : ''Ross has fled in the
direction of Stevenson. The four Skeltons are following
him on horseback with guns to take his life. Ross
does not know of the pursuit. An effort is being made
to get the word to Ross through you that he is thus pur-
sued in order that he may get away from them. If you
do not deliver this word to him he cannot escape them.
Do not deliver that message, say nothing about it, and
thereby prevent his getting away from them.'' A most
careful analysis of the voluminous testimony in this case
convinces us beyond a reasonable doubt that this was
what Tally intended to convey to Huddleston, and that
his message means this and only this to all reasonable
comprehension. Other meanings were suggested at the
hearing in argument, and in testimony as to uncommuni-

cated intention which has been excluded, but the sugges-
tions are either entirely unreasonable in themselves or
do not at all comport with the attendant circumstances.
For instance, it is said that the language of Tally's tele-
gram shows he contemplated that the message to Ross
would be delivered. He said : ''Do not let the party
*warned* get away,'' implying, it is argued, that the party
referred to had been or would be warned by the delivery
of Ed. Ross's message. This view is entirely too literal
and technical. The form of expression employed was
incident to the brevity usual in telegraphic communi-
cation, and was manifestly intended merely as an identi-
fication of the person who was not to be allowed to get
away. Tally did not care to put the name of this per-
son in this message. He knew a message of warning
had been sent to Ross. Ross was the man he did not
want to escape ; and he referred to him as the party
warned in the sense that he was the party to whom the
other message had been started. He meant and his
message meant that Huddleston should not let the party
warned, or intended to be warned, the party referred to
in and by Ed. Ross's message, get away, and not that
Huddleston was to look after a party who had actually
received the message of warning. Moreover, he spoke
over the wires to Huddleston at the same time Ed. Ross's
message was sent, and before there was any possible
chance for the warning to have been given to R. C. Ross.
He knew this. And it was at that juncture, when no-
body had been warned in fact, that he referred to Ross
as the party warned, when he could not have been the
party warned in other sense than as being the party in-
tended to be warned, and for whom a message of warn-
ing had been transmitted from Scottsboro to Stevenson
but not delivered to Ross. And it would seem that he
especially intended his command or request should be
laid upon Huddleston just at this point, for he was care-
ful to tell Whitner, the operator at Scottsboro, that his
message was about the same matter as that of Ed. Ross—
the warning of R. C. Ross—thus impressing upon him
the propriety, not to say necessity, of both being sent at
the same time. They both were sent and received at
the same time, *i. e.* in immediate succession ; and Tally
called upon his friend, Huddleston, not to let the person
referred to in the other get away, and, as we have seen,

indicated to him that the way to prevent his escape was to ''say nothing'' about the other, and indeed either message. Again, it is suggested that Tally intended by his message to have Huddleston, who was mayor of Stevenson, arrest Ross. There are many elements of improbability, to say the least, about this. In the first place, the word ''arrest'' is a most common one and in most universal use. We cannot conceive of any man, and especially not of a lawyer and a judge, employing any other word—and especially when a resort is had to telegraphic communications—to express the idea which this suggestion imputes to Tally—a lawyer and a judge. Then, as we have already seen, there were no grounds for Ross's arrest. Not only did Tally know this, but Huddleston also. The cause of Ross's flight and the Skeltons' pursuit was well known it seems, both in Scottsboro and Stevenson, and to even the most unlearned comprehension the circumstances involveRoss in no liability to arrest. It is said that Tally wanted Ross arrested because he feared that after getting the warning he would lie in wait and kill the Skeltons as they came into Stevenson. This idea is most farfetched in view of Ross's attitude thoughout of being purely on the defensive, and not standing even upon that, but flying from the Skeltons, his whole purpose being to escape from them, and not to kill them. The message itself utterly excludes the possibility of any such interpretation and the existence of any such fear or intention in the mind of Judge Tally. The fear deposed to is, that Ross would entrench himself at Stevenson and kill the Skeltons as they came. The apprehension clearly evinced by the message was that if he got the warning he would get away, and not that he would tarry and fight. If he got away the Skeltons were in no danger. But Huddleston was besought not to prevent his waiting for and killing the Skeltons, nor to do anything in that line at all, but to prevent his getting away from the Skeltons as everybody knew he was endeavoring to do. Again, it surpasses understanding how Huddleston was to arrest Ross, if he obeyed the final injunction of Judge Tally to ''say nothing.'' And that the idea of having Ross arrested was not in Tally's mind further appears from the fact that he would not agree to that being done when it was suggested by Dr. Rorex earlier in the day. Specially in

respect of the words "say nothing" in Tally's message, explanatory suggestions were made by him on the stand. As a reason for them he first said he hoped by their use to keep the scandal secret. As there was nothing in either of the despatches referring to the scandal, the force of this reasoning is not readily felt. But more than this, everybody in Scotsboro and Stevenson knew already a great deal more about the scandal than could possibly have gotten to them through Huddleston saying all he could about those dispatches. Everybody knew it, and Tally must have been fully aware of this general knowledge. Seeming to appreciate the impotency of this suggestion, which however was at first advanced with every appearance of being intended to cover and account for the whole matter, Judge Tally offered another. It was that he meant by using the words "say nothing" to keep Huddleston from disclosing his connection with the message. Why he should have laid such an injunction upon his friend Huddleston, and not upon Judge Bridges to whom he showed the message without these words, nor upon an entire stranger, young Whitner, at Scottsboro, is much more than we can understand. It also surpasses comprehension that he could have expected Huddleston to arrest Ross without saying to him or anybody else a word about the telegram on or because of which the arrest was made. There is nothing in all this. That Tally's message will bear the construction we have put on it and no other, we have no doubt at all, on the considerations we have advanced; and our view of its meaning and intent is strengthened by the respondent's self-consciousness of its bad purpose and intent which is shown by the facts, which the evidence leaves us no room to doubt, that he surreptitiously abstracted the original message from he files in the telegraph office, and swore on the preliminary examination of the Skeltons that he sent a telegram to Stevenson that morning, "but not about this matter. It was to a friend about another matter; nothing concerning this case;" and his further testimony on that trial going to show that he did not know Ed. Ross, did not follow him to the telegraph office, and did not know whether he was in the office while he, Tally, was there or not.

We, therefore, find and hold that John B. Tally, with full knowledge that the Skeltons were in pursuit of Ross

with the intent to take his life, committed acts, namely, kept watch at Scottsboro to prevent warning of danger being sent to Ross, and, with like purpose, sent the message to Huddleston, which were calculated to aid, and were committed by him with the intent to aid, the said Skeltons to take the life of Ross under circumstances which rendered them guilty of murder.

And we are next to consider and determine the second inquiry stated above, namely : Whether it is essential to the guilt of Judge Tally as charged in the second count of the information that the said acts, thus adapted, intended and committed by him; should in fact have aided the said Skeltons to take the life of the said Ross, should have in fact contributed to his death at their hands.

As the life of Ross was not taken by the hands of Tally, the criminal consequences of the homicide could only have been visited upon him at the common law, if at all, as a principal in the second degree or as an accessory before the fact; he could not have been charged, as he is in this information, directly with the crime of murder as a principal in the first degree. Our statute has abolished the common law distinctions between accessories before the fact and principals, and between principals in the first and second degrees in cases of felony, and provided that "all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid or abet in its commission, though not present, must hereafter be indicted, tried, and punished as principals, as in the case of misdemeanors."—Code, § 3704. And though the respondent here is proceeded against by virtue of this statute as a principal in the first degree, the evidence, it being confessed that he did not personally, or in such other way as to make him a principal in the first degree at common law, take the life of Ross, must present him in the light either of an accessory before the fact or as a principal in the second degree, as those distinctions obtained before the enactment of the statute to which we have adverted, or he cannot be convicted. We have already stated our conclusion—and the considerations which led us to it—that Judge Tally did not command, direct, incite, counsel, or encourage the Skeltons to the

[State ex rel. Attorney General v. Tally, Judge, &c.]

murder of Ross. We have failed to find, and have so
stated, that he knew of their felonious purpose before
their departure from Scottsboro in pursuit of Ross. Up
to that time there was no instigation or incitement by
him to the commission of the crime by them, and after
that he did not see or communicate with any of them
until after the death of Ross, and hence pending the
pursuit he could not have encouraged or instigated them
to kill Ross. Judge Tally was, therefore, not, on the
view we take of the evidence, an accessory before the
fact to the killing of Ross. To be guilty of murder,
therefore, not being a common law principal and not be-
ing an accessory before the fact—to be *concerned* in the
commission of the offense within the meaning of our
statute—he must be found to have aided or abetted the
Skeltons in the commission of the offense in such sort as
to constitute him at common law a principal in the sec-
ond degree. A principal in this degree is one who is
present at the commission of a felony by the hand of the
principal in the first degree, and who being thus pres-
ent aids or abets, or aids and abets the latter therein.
The presence which this definition requires need not be
actual, physical juxtaposition in respect of the personal
perpetrator of the crime. It is enough, so far as pres-
ence is concerned, for the principal in the second degree
to be in a position to aid the commission of the crime by
others. It is enough if he stands guard while the act is
being perpetrated by others, to prevent interference with
them or to warn them of the approach of danger; and it
is immaterial how distant from the scene of the crime
his vigil is maintained provided it gives some promise of
protection to those engaged in its active commission.
At whatever distance he may be, he is present in legal
contemplation if he is at the time performing any act in
furtherance of the crime, or is in a position to give in-
formation to the principal which would be helpful to the
end in view, or to prevent others from doing any act, by
way of warning the intended victim or otherwise, which
would be but an obstacle in the way of the consumma-
tion of the crime, or render its accomplishment more
difficult. This is well illustrated by the case of *State of
Nevada v. Hamilton and Laurie*, 13 Nev. 386, in which a
plan was arranged between Laurie and others to rob the
treasure of Wells, Fargo & Co., on the road between

Eureka and some point in Nye county. Laurie was to ascertain when the treasure left Eureka, and signal his confederates by building a fire on the top of a mountain in Eureka county; which could be seen by them in Nye county, thirty or forty miles distant. This signal was given by him, and his confederates, advised by it, met the stage, attacked and attempted to rob it, and in the attempt killed one of the guards. Laurie was indicted with the rest for murder, and put on his trial in Nye county, and made the point that inasmuch as a statute of Nevada required that an accessory before or after the fact should be tried in the county where his offense was committed, he could not be held under the pending indictment or tried in the county of Nye, where the robbery was attempted, and the murder committed. But the Supreme Court of that State held that, if he was an accessory before the fact, he was also in legal contemplation present and aiding and abetting *at* the fact, and was, therefore, a principal in the second degree, and indictable, triable and punishable in Nye county as principal in the first degree, under a statute like section 3704 of our Code. He was constructively present, though thirty or forty miles away, and he was guilty as a principal in the second degree in that from and across this distance he aided and abetted his confederates by the beacon lights which he set upon a hill. It was as if he had been endowed with a voice to compass the intervening space and to advise his accomplices of the approach of the treasure, or as if his words had been transmitted over a telephone or a telegraph line to the ears of his distant confederates. This treasure stage was proceeding on its way without notice to those in charge of it of the impending onslaught upon it. If it had been apprehended by Laurie and his confederates that the people of Eureka—those interested in the treasure, and in the lives of the guards who went with it—would, after its departure, become aware of the situation and dispatch a courier to overtake the stage and warn its occupants, and Laurie had remained there to give warning by signal lights or telegram of the departure of this courier so that he might be intercepted and his message stopped and the stage set upon unawares, and all this had been done, it cannot for a moment be doubted that on these facts also Laurie would have been present at the scene

of the attempted robbery in legal sense, and been guilty thereof as a principal in the second degree, though he was all the while much further away in point of physical fact than the distance between Scottsboro and Stevenson. And this upon the principle, as stated by the Nevada court, that "Where several persons confederate together for the purpose of committing a crime which is to be accomplished in pursuance of a common plan, all who do any act which contributes to the accomplishment of their design' are principals, whether actually present at its commission or not, They are deemed to be constructively present, though in fact they may be absent."—1 Bish. Cr. Law, § 650; 1 Chitty Cr. Law, p. 256; 1 Whar. Cr. Law, §§ 206 et seq.; Roscoe's Cr. Evidence, pp. 178–9; Raiford v. State, 59 Ala. 106; Griffith v. State, 90 Ala. 583.

So far, therefore, as presence goes Judge Tally, on guard at Scottsboro to prevent warnings being sent to Ross or intercepting or attempting to intercept messages of warning which had started on their flight, was in legal contemplation present at Stevenson, the scene of the homicide, standing over Huddleston to stay him in the performance of his duty of delivering warnings to Ross. He was constructively there, and hence, for all practical legal purposes, actually there. Being thus present, did he aid or abet the killing of Ross? What is meant by these terms, and what has one to do to bring himself within them? It is said in *Raiford's Case*, *supra*, that "the words aid and abet are pretty much the synonyms of each other;" and this has doubtless come to be true in the law though originally a different meaning attached to each. The legal definition of "aid" is not different from its meaning in common parlance. It means to assist, to supplement the efforts of another. Rap. & L. Law Dict., p. 43. "Abet" is a French word compounded of the two words *a* and *beter*, to bait or excite an animal; and Rapalje and Lawrence thus define it: "To abet is to incite or encourage a person to commit crime; an abettor is a person who, being present or in the neighborhood, incites another to commit a crime, and thus becomes a principal in the offense."—Rap. & L. Law Dict., p. 4. By the amalgamation of the two words in meaning—by making synonyms of them—it may be said that to abet has come to mean to aid by

presence, actual or constructive, and incitement, and that to aid means not only actual assistance, the supplementing of another's efforts, but also presence for the purposes of such actual assistance as the circumstances may demand or admit of, and the incitement and encouragement which the fact of such presence for such purposes naturally imports and implies. So we have this definition of the two terms by the late Chief Justice Stone: "The words aid and abet, in legal phrase, are pretty much the synonyms of each other. They comprehend all assistance rendered by acts, or words of encouragement or support or presence, actual or constructive, to render assistance should it become necessary. No particular acts are necessary. If encouragement be given to commit the felony, or if, giving due weight to all the testimony, the jury are convinced beyond a reasonable doubt that the defendant was present with a view to render aid should it become necessary, then that ingredient of the offense is made out."—*Raiford v. State,* 59 Ala. 106. This definition was sufficient for the case then in hand, and it is in the form not infrequently found in the books. But it is incomplete. Mere presence for the purpose of rendering aid obviously is not aid in the substantive sense of assistance by an act supplementary to the act of the principal. Nor is it aid in the original sense of abetting, nor abetting in any sense, unless presence with the purpose of giving aid, if necessary, was preconcerted or in accordance with the general plan conceived by the principal and the person charged as an aider or abettor, or, at the very least, unless the principal knew of the presence, with intent to aid, of such person. For manifestly in such case, there being no actual, substantive assistance and no encouragement by words, the only aid possible would be the incitement and encouragement of the fact that another was present for the purpose of assistance, and with the intent to assist if necessary. And in the nature of things, the fact of presence and purpose to aid could not incite or encourage or embolden the principal unless he knew of the existence of that fact. That kind of aid operates solely upon the mentality of the actual perpetrator; when rendered at all it is by way of assurance to his mind in the undertaking he is upon, and it nerves him to the deed and helps him execute

it through a consciousness—a purely mental condition— that another is standing by in a position to help him if help becomes necessary ; who will come to his aid if aid is needed. And that there could be this consciousness without any knowledge of the fact of such other's pres- ence and purpose can not be conceived. That one may be encouraged or incited to an act by a consideration of which he is wholly oblivious and which has never ad- dressed itself to his mind, is far beyond the limit of finite comprehenson. The definition we have quoted is, as an abstract proposition, clearly at fault. As applied in the concrete *to cases of confederacy* as it is, we under- take to say, whenever it is stated in this form, it is free from objection. But in the absence of confederacy, or at least of knowledge on the part of the actual perpetra- tor of a crime, one can not be a principal in the second degree who is present intending to aid and does not aid by word or deed. The definition must go further. It should appear by it that to be an aider or abettor when no assistance is given or word uttered, the person so charged must have been present by preconcert, special or general, or at least to the knowledge of the principal, with the intent to aid him. This view is very clearly stated by Mr. Wharton. He says : ''It is not necessary, therefore, to prove that the party actually aided in the commission of the offense ; if he watched for his com- panions in order to prevent surprise, or remained at a convenient distance in order to favor their escape, if necessary, or was in such a · situation as to be able readily to come to their assistance, *the knowledge of which was calculated to give additional confidence to his companions*, in contemplation of law, he was aiding and abetting.'' (The italization is ours.)—1 Whart. Cr. Law, § 210. And the same idea is thus expressed by Mr Stephens in his summary of Criminal Law : ''The aid- ing and abetting must involve some participation; mere presence without participation, will not suffice if no act whatever is done in concert, and no confidence *intentionally* imported by such presence to the perpetrators.'' See *Con- naughty v. State*, 1 Wis. 143, 144. And Mr. Bishop says : ''A principal in the second degree is one who is present *lending his countenance and encouragement*, or otherwise *aiding*, while another does the act.''—1 Bish. Cr. Law, 648. And Mr. Wharton further says : ''Something

must be shown in the conduct of the bystander, which indicates [to the perpetrator, manifestly] a design to encourage, incite, or, in some manner afford aid or consent to the particular act; though when the bystander is a friend of the perpetrator, and knows that his presence will be regarded by the perpetrator as an encouragement and protection, presence alone will be regarded as an encouragement. * * * The confederacy must be real; * * * mere consent to a crime, when no aid is given, and no encouragement rendered, does not amount to participation."—1 Whart. Cr. Law, §§ 211 a, 211 c, 211 d. And to like effect are the following authorities : *The People v. Woodward*, 45 Cal. 293; *White v. The People*, 81 Ill. 333 ; *Cooper v. Johnson*, 81 Mo. 483 ; *Noftsinger v. State*, 7 Tex. App. 301 ; *True v. Commonwealth*, 14 So. W. Rep. 684 ; 1 Am. & Eng. Encyc. of Law, p. 62 ; Whart. Cr. Ev., 440. Our own cases fully support these views. Thus in *Wicks v. State*, 44 Ala. 398, with reference to section 3704 of the Code, it is said : "The testimony must show an actual participation in the commission of the offense, else the party charged can not be convicted under this statute." And in *Cabbell v. State*, 46 Ala. 195, a mob had overpowered an officer and taken his prisoner into a house, where they were assaulting him with intent to murder. The defendant, coming upon the scene at this juncture, and being informed that the mob was trying to kill the prisoner on account of the offense for which he had been arrested, said : "That is right, kill him; God damn him." The question was whether on this evidence the defendant was an aider and abettor in the assault made by the mob ; and upon this the court said : "It is not pretended that the defendant committed the assault—it was the act of the mob; nor was it seriously contended that he was in fact a member of that unlawful assembly. Consequently the words uttered by him can not be held to have encouraged or aided the persons by whom the assault was committed, unless addressed to or at least heard by them or some of them." Here Cabbell had the guilty intent; he wanted the prisoner killed ; and he did an act calculated to contribute to the execution of that intent; he uttered words of encouragement and incitement. But he was adjudged to be no' guilty, because what he did, though with criminal

intent and calculated to accomplish or aid in the accomplishment of a criminal result, did not in point of fact contribute to that result. And this proposition is directly supported by *Raiford v. State, supra,* when the elliptical definition of aid and abet is rounded out, as we have shown it must be, and also in a general way by *Frank v. State,* 27 Ala. 37; *Tidwell v. State,* 70 Ala. 33; *Jordan v. State,* 79 Ala. 9, 13, and *Griffith v. State,* 90 Ala. 583.

We are therefore clear to the conclusion that before Judge Tally can be found guilty of aiding and abetting the Skeltons to kill Ross, it must appear that his vigil at Scottsboro to prevent Ross from being warned of his danger was by preconcert with them, or at least known to them, whereby they would naturally be incited, encouraged and emboldened—"given confidence"—to the deed, or that he aided them to kill Ross, contributed to Ross's death in point of physical fact by means of the telegram he sent to Huddleston.

The assistance given, however, need not contribute to the criminal result in the sense that but for it the result would not have ensued. It is quite sufficient if it facilitated a result that would have transpired without it. It it is quite enough if the aid merely renders it easier for the principal actor to accomplish the end intended by him and the aider and abettor, though in all human probability the end would have been attained without it. If the aid in homicide can be shown to have put the deceased at a disadvantage, to have deprived him of a single chance of life, which but for it he would have had, he who furnishes such aid is guilty though it can not be known or shown that the dead man, in the absence thereof, would have availed himself of that chance. As where one counsels murder he is guilty as an accessory before the fact, though it appears to be probable that murder would have been done without his counsel, and as where one being present by concert to aid if necessary is guilty as a principal in the second degree, though had he been absent murder would have been committed, so where he who facilitates murder, even by so much as destroying a single chance of life the assailed might otherwise have had, he thereby supplements the efforts of the perpetrator, and he is guilty as principal in the second degree at common law, and is principal in the first degree under our statute, notwithstanding it may

be found that in all human probability the chance would not have been availed of, and death would have resulted anyway.

We have already said enough to indicate the grounds of the conclusion which we now announce, that Tally's standing guard at the telegraph office in Scottsboro to prevent Ross's being warned of the pursuit of the Skeltons was not by preconcert with them, and was not known to them. It is even clear, and more certain that they knew neither of the occasion nor the fact of the sending of the message by him to Huddleston. And hence they were not and could not have been aided in the execution of their purpose to kill by the keeping of this vigil, or by the mere fact of the forwarding of the message to Stevenson, since these facts in and of themselves could not have given them any actual, substantial help, as distinguished from incitement and encouragement, and they could not have aided them by way of incitement and encourment, because they were ignorant of them. And so we are come to a consideration of the effect, if any, produced upon the situation at Stevenson by the message of Judge Tally to Huddleston. Its effect upon the situation could only have been through Huddleston, and upon his action in respect of the delivery to Ross of the message of warning sent by Ed. Ross. This latter message reached Huddleston for Ross, we suppose, about five minutes—certainly not more than ten minutes—before Ross arrived at Stevenson. Immediately upon the heels of it, substantially at the same time, Tally's message to Huddleston was received by the latter. Ed. Ross's message imported extreme urgency in its delivery, and Tally's to Huddleston, though by no means so intended, emphasized the necessity and importance, from the standpoint of duty, for the earliest possible delivery of Ed. Ross's message to Robert C. Ross; and it was the manifest duty of Huddleston to deliver it at the earliest practicable moment of time.—Law of Telegraphy, *Scott & Jernigan*, § 188. Huddleston appears to have appreciated the urgency of the case, and at first to have intended doing his duty. Upon receiving the two messages, he went at once without waiting to copy them to the Stevenson Hotel, which is located very near the telegraph office, in quest of Ross, upon the idea that he might have already arrived. We are to presume a purpose to do what duty

enjoins until the contrary appears; and we, therefore,
shall assume that Huddleston intended to deliver the
message to Ross, or to inform him of its contents had he
been in the hotel.    Not finding him there, for he had not
yet reached Stevenson, Huddleston returned to the door
of the depot up stairs in which was the telegraph office.
By this time the command which Judge Tally had laid
upon him had overmastered his sense of duty and divert-
ed him from his purpose to deliver Ed. Ross's message
to Robert.    Standing there at the door he saw a hack
approaching from the direction of Scottsboro.    He said
then that he supposed Ross was in that hack.    We do not
think it was incumbent upon him, inasmuch as the hack
was being driven directly to the depot, to go down the
road to meet it, though the situation was then more ur-
gent than was indicated by the telegrams in that the
Skeltons were at that time skulking on the flanks of and
immediately behind the hack; but there is no evidence
that Huddleston knew this.    But we do not doubt that
it was Huddleston's duty to go out to the road along
which the hack was being driven, at a point opposite
his own position at the depot, and near to it, and there
and then have delivered the message or made known its
contents to Ross.    The only explanation he offers for not
then delivering the message or making known its con-
tents to Ross was—not that he could not have done it,
that was entirely practicable—but that he had not taken
a copy of it; a consideration which did not prevent his
going to the hotel for the purpose of delivery before he
saw Ross approaching, and which, had his original pur-
pose continued, we cannot believe would have swerved
him from his plain duty at this juncture.    Presuming
that he would have done this because it was his duty to
do it—a duty which he at first appreciated—and finding
as a fact that he did not do it, the reason for his default
is found in the injunction laid upon him by Judge Tally.
He did not warn Ross because he did not want Ross to
get away, and this because Judge Tally had asked him
not to let Ross get away.    So that as he stood there at
the door he mapped out a course of action.    He would
not deliver the message immediately, if at all, but he
would send off for the town marshal, and in the mean-
time he would call William Tally from over the way and
confer with him as to what should be done; Ross to be

the while wholly unadvised of the contents of the message from his kinsman, and wholly ignorant of the pursuit of the Skeltons. So he sends a man in search of the marshal whose whereabouts, and of consequence the time necessary to find and bring whom to the station, were unknown; beckons to William Tally to come to him, then turns and goes up stairs into the telegraph office. He says he went up there to copy Ross's message for delivery to him. If this be true, this was only another factor, so we have seen, in the delay that Judge Tally's message had determined him upon, for while at first he was anxious to deliver the message or its contents uncopied to Ross, when he thought Ross might be at the hotel, and went there to find him for that purpose, when Ross was actually in sight of him and rapidly approaching him, he deemed it most important to copy the message before advising Ross. It was also into this up stairs office that he invited William Tally, and we cannot escape the conclusion that his purpose in going there before delivering the message was to have a consultation with William Tally as to what should be done before advising Ross, and also to give the marshal time to arrive, so that, should they conclude to adopt that course, they could have Ross arrested. And it cannot, we think, be doubted that he then had no purpose whatever of apprising Ross of the contents of the message, if ever, until he had had this conference with the brother of the man who had asked him not to deliver it at all. That this delay was to conserve such ulterior purpose as might be born of this conference, was wholly unwarranted and was caused by the telegram of Judge Tally to Huddleston, we believe beyond a reasonable doubt.

It remains to be determined whether the unwarranted delay in the delivery of the message to Ross, or in advising him of its contents, thus caused by Judge Tally with intent thereby to aid the Skeltons to kill Ross, did in fact aid them or contribute to the death of Ross by making it easier than it would otherwise have been for the Skeltons to kill him, by depriving him of some advantage he would have had had he been advised of its contents when his carriage stopped or immediately upon his alighting from it, or by leaving him without some chance of life which would have been his had Huddleston done his duty.

[State ex rel. Attorney General v. Tally, Judge, &c.]

The telegram, we have said, should have been de-livered, or its contents made known, to Ross at the time the hack came opposite where Huddleston was and stopped. Huddleston and William Tally were equidis-tant from this point when the former called to the latter, at which time also Huddleston had seen the hack ap-proaching this point. Tally, going to Huddleston, reached this middle point between them, unhastened as Huddleston should have been by the urgency of the mes-sage, just as the carriage got there and stopped. It is, therefore, clear that had Huddleston, instead of calling Tally and going into the depot, himself have gone out to the road along which the carriage was approaching, and which was not more than one hundred feet from him, he would have gotten there certainly by the time it stopped, and have acquainted Ross with the contents of the mes-sage, with the fact that four men were pursuing him with guns to take his life, before Ross alighted from the hack.

Being thus advised, and not knowing of the immediate proximity of the Sheltons, it may be that Ross would have alighted as he did, exposed himself to the Skeltons' fire as he did and been killed as he was. But on the other hand, the Skeltons were at that time dismounted, and two of them at least, a long way from their horses, and none of them were in his front up the road, and he had a chance of escape by continued flight in the vehicle. Again, he might then and there have put himself under the protection of Huddleston as an officer of the law and had the bystanders, those in the immediate neighbor-hood, of whom there were several, summoned to help protect him. This might have saved his life; it was a chance that he had. But, if it be conceded that, as he would not have known of the proximity of the Skeltons from mere knowledge that they were in pursuit, he would have alighted precisely as and when he did, yet when the first shot was fired Ross would have known that the man who fired it was one of the Skeltons, and that three others of them were present in ambush armed with guns to take his life. Knowing this, the hopeless-ness of standing his ground and attempting to defend himself from his enemies, overpowering in number and secure in their hiding places, while he stood in the open street, would have been at once manifest to him; and in-

stead of standing there as he did, knowing only as he did that some one man, whom he did not know, had fired a gun, and peering and craning his neck to see whence the shot came and who fired it, he could and doubtless would have sought safety by flight in the opposite direction, in which was the Union Hotel scarce an hundred feet away. And in view of the fact that he was hit only once by the numerous shots that were fired at him while he stood there in the open, and that not in a vital or disabling part, it is very probable that had he attempted that mode of escape, as soon as the first shot was fired, he would have reached the hotel in perfect safety. Certain it is that in making that effort he would have gone away from the lurking places of his enemies, and he would not, as he did in his ignorance of the true situation, have placed himself where John Skelton at close quarters could and did shoot him to death from behind his back. But whether he would or would not have reached a place of refuge, we need not inquire or find. The knowledge that he would have had, if the telegram of Ed. Ross had been delivered to him when it could and should have been delivered, of the pursuit of the Skeltons, together with the knowledge which would have been imparted to him by the report of the first gun in connection with the contents of the message, would instantly have advised him of the extent of his danger—a danger which he could not combat, which was deadly in character and from which, as he would naturally have been at once impressed, the only hope of escape lay in immediate flight. That was a chance for his life that this knowledge would have given him. That was a chance of which the withholding of this knowledge deprived him. Tally's telegram to Huddleston deprived him of that knowledge. Tally through Huddleston deprived him of that chance. Again, after having been shot in the legs and partially disabled by one of the many shots fired at him by Robert, James, and Walter Skelton, as he stood fully exposed to their broadside, he in his then crippled condition made an effort to find protection behind the oil house, the nearest building to him. Only these three men had fired up to that time. He knew of the presence of these three only. The house sheltered him from two of these men and partially also from the third. He got there and stood facing in the

direction these three were.   And he called aloud for pro-
tection from them meantime keeping a lookout for them
and intending no doubt to protect himself from them if
he could.   He knew of the presence of these three only.
Nobody had seen John Skelton.   He did not know that
John Skelton was there.   Had he gotten Ed. Ross's tele-
gram this he would have known, that there were four of
them, that only three had shot at him, that the other
was somewhere hidden in the immediate vicinity.   And
while seeking to escape from or guard himself from the
other  three,  while  he  was  by  the  side  of  the  oil
house,  he  would  also  have  sought  to  guard  himself
against  the  fourth.   He  was  off  his  guard  as
as to this fourth man, John Skelton, because he was
ignorant of his presence.   This ignorance was directly
due to Tally's active interference.   Tally's aid to the
Skeltons by way of preventing Ross being warned ena-
bled John Skelton to come upon Ross from his rear and
shoot him down.   Ross went to his death, guarding
himself against the other three and calling for protec-
tion from them without even knowing that the man who
killed him was nearer to him than Scottsboro.   Can it
be doubted that Ross's utter ignorance of John Skel-
ton's presence, with the others at Stevenson, made it
easier for John Skelton to take his life?   Can it be
doubted that his ignorance of the presence of all four
Skeltons, when the first gun was fired by Robert Skel-
ton at Bloodwood, when had he known it, he could have
fled in the appreciable time between the time of the firing
of this first and the other shots—the next one being
fired by the same man—made it easier for them to take
his life?   Can it be doubted in any case that murder by
lying in wait is facilitated by the unconsciousness of the
victim?   Or in any case, that the chances of the inten-
ded victim would be improved and his death rendered
more difficult of accomplishment, if the first unfruitful
shot apprises him of the number and identity of his
assailants and the full scope and measure of their mo-
tive and purposes?   We cannot believe otherwise.   It
is inconceivable to us, after the maturest consideration, re-
flection and discussion, but that Ross's predicament was
rendered infinitely more desperate, his escape more dif-
ficult and his death of much more easy and certain ac-
complishment by the withholding from him of the mes-

sage of Ed. Ross. This withholding was the work of Judge Tally. An intent to aid the Skeltons to take the life of Ross actuated him to it. The intent was effectuated, they thereby were enabled to take him unawares, and to send him to his death without, we doubt not, his ever actually knowing who sought his life, or being able to raise a hand in defense, or to take an advised step in retreat. And we are impelled to find that John B. Tally aided and abetted the murder of Robert C. Ross, as alleged in the second specification of the second count of ⁎ the information; and to adjudge that he is guilty as charged in that specification, and guilty of murder as charged in said second count. And judgment deposing him from office will be entered on the records of this court.

No consideration or conclusion of fact in this opinion must be allowed to exert any influence upon the trials of the Skeltons and Judge Tally on the indictments for murder now pending against them.

HEAD, J., *dissenting.*—I am of opinion the respondent should be acquitted of both charges. I do not believe, beyond a reasonable doubt, that respondent intended, in sending the telegram to Huddleston, to aid or abet in the murder of Ross. I do not believe, beyond a reasonable doubt, that the telegram of warning would have been delivered to Ross by Huddleston, before the shooting began, if the telegram of the respondent had not been sent.

BRICKELL, C. J., not sitting.